UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RAFAEL A. VEGA,                    )
          Plaintiff               )
                                  )
          v.                      )    C.A. No. 10-cv-30129-MAP
                                  )
MICHAEL J. ASTRUE,                )
COMMISSIONER, SOCIAL              )
SECURITY ADMINISTRATION,          )
          Defendant               )


MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION TO AFFIRM DECISION OF THE COMMISSIONER
(Dkt. Nos. 12 & 15)

September 19, 2011

PONSOR, S.J.

I. INTRODUCTION

This action seeks review of a final decision of the

Commissioner of Social Security ("Commissioner") denying

Plaintiff's applications for disability insurance benefits

("DIB") and Supplemental Security Income ("SSI").  Plaintiff

applied for DIB and SSI on September 2, 1999, alleging

disability since August 14, 2008, due to arthritis, lower

back pain, and Hepatitis C.  Plaintiff's claim was denied

initially on February 23, 2002, but in August 2002, the

Appeals Council vacated the decision and remanded the case for further proceedings. (A.R. 232, 270-73.) On February 14, 2003, the ALJ issued a second unfavorable decision. (A.R. 21-37.) The Appeals Council denied Plaintiff's request for review, at which time Plaintiff filed suit in this court. On November 14, 2005, this court remanded the case with instructions to obtain additional evidence, request a consultative orthopedic examination, evaluate Plaintiff's mental impairments, evaluate Plaintiff's residual functional capacity ("RFC"), and obtain evidence from a vocational expert ("VE"). (A.R. 552-54.) Following a November 30, 2006, hearing before a different judge, the ALJ found Plaintiff not disabled. (A.R. 527-41.) On February 18, 2010, the Appeals Council declined to assume jurisdiction, making the ALJ's decision final and subject to judicial review.

Plaintiff now moves for judgment on the pleadings (Dkt. No. 12), and Defendant moves for an order affirming the decision of the Commissioner (Dkt. No. 15). For the reasons stated below, Plaintiff's motion will be denied, and Defendant's motion will be allowed.

A.   <u>Physical Conditions</u>.

Plaintiff is a high-school graduate and was forty-eight years old at the time of his administrative hearing. (A.R. 210, 657).

On July 20, 1999, x-rays of Plaintiff's cervical spine indicated a possible muscle spasm and were otherwise normal. (A.R. 140.) X-rays of Plaintiff's lumbar spine indicated minimal degenerative changes and were otherwise normal. (<u>Id.</u>) Follow-up x-rays of Plaintiff's lumbar spine, which took place one week later, confirmed "minimal degenerative facet changes at all levels" and a minimal disc bulge. (A.R. 134.)

An abdominal ultrasound on August 19, 1999, showed "no significant abnormality." (A.R. 348.) A September 1, 1999, liver biopsy confirmed a diagnosis of Hepatitis C. (A.R. 123, 126.)

Plaintiff was referred to Dr. Jose Azocar on November 30, 1999, for a consultative physical examination. (A.R. 154-156.) Dr. Azocar found that Plaintiff moved his extremities well, had no deformities, displayed optimal

strength bilaterally, and had normal posture and gait.
(A.R. 155-56.)  He also noted that Plaintiff would be
limited by activities that would exacerbate his back pain,
including frequent bending and lifting heavy weights.  (A.R.
156.)

Plaintiff presented to Pioneer Valley Pain Management &
Palliative Medicine Center ("Pioneer Center") on January 27,
2000, complaining of back pain and numbness in his right
upper extremity.  (A.R. 165-68.)  On examination, Dr.
Bentley Ogoke observed that Plaintiff's deep tendon
reflexes, sensation, and motor strength were within normal
limits; judgment, concentration, and memory were intact;
coordination and balance were good; cervical spine range of
motion was within normal limits; straight leg raising was
negative; grip strength was equal.  The only findings of
note were tenderness in certain areas of Plaintiff's back.
(A.R. 167.)  A January 31, 2000, x-ray of Plaintiff's dorsal
spine revealed no abnormalities.  (A.R. 163, 169.)

On February 4, 2000, Plaintiff returned to Dr. Ogoke at
the Pioneer Center with neck, left shoulder, and low back
pain, reporting a pain level of six out of ten.  Dr. Ogoke

4

observed some tenderness in Plaintiff's back, but Plaintiff reported that physical therapy had improved his pain.  (A.R. 163.)  Plaintiff demonstrated a normal gait and showed no difficulty in routine diagnostic tests, including straight leg raising.  (A.R. 163.)

A week later, Plaintiff described his pain as five out of ten, but noted that he had discontinued his pain medication because it caused nausea and vomiting.  (A.R. 161.)  He reported that bioelectric treatment had significantly improved pain in his neck and left shoulder.  (A.R. 161.)  The examination again revealed some tenderness in his back.  (A.R. 161.)  Plaintiff was advised to continue his home exercise program and medications with the exception of the medication that caused Plaintiff's intestinal problems.  (A.R. 162.)

On June 30, 2000, Plaintiff underwent an MRI of his thoracic spine, which showed no abnormality.  (A.R. 373.)  On June 15, 2001, x-rays of Plaintiff's shoulders revealed no abnormality.  (A.R. 423.)

Plaintiff reported to clinicians at Northgate Medical Center on October 21, 2004, that he had stopped taking his

insulin for diabetes because the needles were "too fat" and hurt him.  (A.R. 597-98.)

During May 2006, Northgate Medical Center records indicate that Plaintiff had stopped taking his medication five or six months earlier because he did not like the way it made him feel.  However, his blood sugar was under control.  (A.R. 594-95.)

An examination by Dr. Willard Brown on December 13, 2006 revealed that Plaintiff had a normal gait and did not report any pain during movement.  (A.R. 643-47.)  His upper and lower extremities, sensory exam, and strength and motor function were normal.  (A.R. 643-44.)  Dr. Brown determined that Plaintiff "may have problems doing any activities where he would have to stand too long, sit too long, or go up and down stairs too frequently."  (A.R. 647.)  Dr. Brown also noted possible difficulties working on a stepladder or stool, or performing activities involving "excessive bending, twisting, heavy lifting, or other strenuous activities."  (A.R. 647.)

B.   Mental Conditions.

Between March and July 2000, Plaintiff was seen by

Sisters of Providence Behavioral Healthcare ("Sisters of Providence"). (A.R. 181-87.) He reported depression, anxiety, insomnia, and irritability. (A.R. 181.) At an evaluation on March 9, Plaintiff reported that his depression and substance abuse stemmed in part from the recent loss of four members of his family. (A.R. 360.) His global assessment of functioning (GAF) score at that time was 50, his highest score of the year was 90, and his expected GAF score upon discharge was 80.[1] (A.R. 184, 360.)

On November 27, 2000, Dr. Michael Braverman conducted a consultative mental examination. (A.R. 375-77.) Dr. Braverman observed no signs of thought disorder, psychosis, hallucinations, delusions, paranoia, or pressured speech. (A.R. 376.) However, when Dr. Braverman listed seven digits and asked Plaintiff to recall as many as he could, Plaintiff could only recall the first three. (A.R. 376.) When asked

_____

[1] A GAF of 41-50 indicates serious symptoms such as suicidal ideation, or any serious impairment in social, occupational, or school functioning, such as having no friends or being unable to keep a job. A GAF of 81-90 indicates absent or minimal symptoms, good functioning in all areas, involvement in a wide range of activities, socially effectiveness, general satisfaction with life, and no more than everyday problems or concerns. Diagnostic and Statistical Manual of Mental Disorders 4th ed. 34 (4th ed. 2000) (DSM-IV).

to spell "house" and "world," Plaintiff misspelled both words. (A.R. 376.) Plaintiff reported that he had ingested alcohol and cocaine a few days prior. (A.R. 376.) Dr. Braverman observed that Plaintiff appeared to be depressed and concluded that Plaintiff needed a highly structured dual-diagnosis treatment program to help him to achieve and maintain sobriety. (A.R. 375-77.) Dr. Braverman largely reiterated these findings in a second consultative exam on May 17, 2001. (A.R. 437-38.)

At a visit with his therapist, Edmund Bouley, on August 2, 2001, Plaintiff evidenced symptoms of sadness and hopelessness. (A.R. 412.) Mr. Bouley prescribed anti-depressants and sleeping medication. (A.R. 413.)

On June 17, 2002, Plaintiff was referred to Dr. Rafael Mora de Jesus for a psychological evaluation. In connection with this, Plaintiff undertook a series of tests, including the Weschler Memory Scale, the Bender Gestalt test, and the WAIS III examination. Dr. Mora de Jesus determined that Plaintiff's test results appeared "bizarre" in that they were consistent with someone who would be incapable of independently functioning without significant support, yet

Plaintiff's in-person assessment and current living situation demonstrated otherwise. (A.R. 435.) With respect to the Bender Gestalt test in particular, Dr. Mora de Jesus noted that "the magnitude of the errors are indicative of severe perceptual distortion or of minimal motivation to perform on the tasks presented to him." (A.R. 435.) Consequently, Dr. Mora de Jesus determined that Plaintiff's actual symptoms consisted of mild anxiety and that employment would benefit him by increasing his self-esteem. (A.R. 432-36.)

On October 1, 2002, Plaintiff was seen by Dr. Martin Markey. Plaintiff's test results indicated a wide variety of extreme symptoms, which Dr. Markey determined was "the result of carefully responding rather than responding in an inconsistent or random pattern." (A.R. 453.) Plaintiff achieved "an extraordinarily elevated 'F' score," which Dr. Markey labeled a "fake bad score." (A.R. 453.) Consequently, Dr. Markey concluded that Plaintiff's test results were invalid, and he observed that Plaintiff was operating in the average or low-average range of intelligence. (A.R. 452.) He further explained that

Plaintiff was "not at all mentally retarded," and that,
given the "extreme exaggeration" of his symptoms, Plaintiff
was malingering.  (A.R. 453.)

C.   RFC Assessments.

   1.   Physical RFC.

   On April 5, 2000, Dr. Jorge Baez-Garcia, a non-
examining state agency physician, reviewed the medical
evidence of record and assessed Plaintiff's physical RFC.
He found that Plaintiff suffered from no significant
physical limitations and was capable of performing light
work.  (A.R. 172-77.)

   On September 25, 2000, Dr. Ogoke opined that evidence
of degenerative change in Plaintiff's lumbar x-rays was
suggestive of a "significant inflammatory process."  (A.R.
372.)  He concluded that Plaintiff would be able to lift
five pounds and carry ten pounds occasionally over the
course of an eight-hour work day.  He also found that
Plaintiff could stand one-to-two hours and sit two-to-four
hours in an eight-hour workday.  (A.R. 371-72.)

   On January 22, 2001, Dr. Marcia Lipski, a state agency
physician, reviewed the evidence of record and found

Plaintiff capable of performing light work.  (A.R. 396-403.)

   2.   Mental RFC.

   On November 17, 2000, Dr. Joseph Litchman, a
state agency psychologist, reviewed the record and completed
a mental RFC assessment.  (A.R. 378-95.)  Dr. Litchman
concluded that Plaintiff would have difficulty remembering
complex material, could understand and remember one and two
step tasks, and could follow through with simple routines
when motivated.  (A.R. 394.)

D.   Hearing Testimony.

   Plaintiff testified at the administrative hearing that
his back problems were due to wrestling matches and street
fights.  (A.R. 661.)  He stated that his back pain was ten
out of ten without medication and a seven out of ten with
medication.  (A.R. 668.)  The pain, he reported, made it
impossible for him to continue working as a truck driver.
(A.R. 662.)

   At the time of the hearing, Plaintiff had been living
in a rehabilitation center for the previous five weeks,
which followed his release from incarceration for
distributing crack cocaine in April 2005.  At that time, he

11

had been sober for three months.  (A.R. 658, 665-66.)

Plaintiff elaborated on his living situation in the

following exchange:

> Q:  How did you support yourself over the last
>     eight years?
>
> A:  I got, off and on, a little assistance from
>     Welfare.
>
> Q:  Do you get food stamps?
>
> A:  Yes.
>
> Q:  Do you have Mass Health?
>
> A:  Yes.
>
> Q:  Okay.  No work activity?
>
> A:  No.
>
> Q:  Part-time?
>
> A:  No.
>
> Q:  Cash?  Volunteer?  Nothing?
>
> A:  No.

(A.R. 660.)  Plaintiff also testified that he bathed,

groomed, and dressed himself independently, cleaned the

bathroom every now and then, and went to church services

twice a week.  (A.R. 670-71.)

A VE testified that an individual with Plaintiff's age,

education, vocational background, and RFC would be capable

of performing work existing in significant numbers in the

national economy, including as a packer, inspector, and

assembler.  (A.R. 683-85.)

E.    ALJ's Findings.

At Step One of the disability adjudicative process, the

ALJ found that Plaintiff had not engaged in substantial

gainful activity since August 14, 1998, the alleged onset

date.  (A.R. 532.)  At Step Two, the ALJ found that

Plaintiff had the severe impairments of degenerative

disc disease, Hepatitis C, diabetes, depression, personality

disorder, post traumatic stress disorder and polysubstance

dependence.  (A.R. 532.)  At Step Three, the ALJ found that

Plaintiff's impairments did not meet or medically equal any

of the listed impairments.  (A.R. 533.)  At Step Four, the

ALJ determined that Plaintiff retained the RFC to perform

light work, with the following additional limitations:

Plaintiff would require a sit/stand option; would be limited

to simple, unskilled tasks; could not perform overhead

reaching or lifting; would be limited to incidental contact

with the public and occasional contact with coworkers; would

avoid work involving heights, ladders, ropes, and scaffolds;
would avoid extreme cold and vibration; and could not lift
more than ten pounds from the floor to waist level. (A.R.
533.)

In light of this RFC, the ALJ found that Plaintiff was
unable to perform his past relevant work of truck driving.
(A.R. 540.) At Step Five, the ALJ concluded that Plaintiff
could perform other work that existed in significant numbers
in the national economy and thus found that Plaintiff was
not disabled. (A.R. 540-41.)

### III. <u>DISCUSSION</u>

Plaintiff argues that the ALJ erred by (1) providing an
RFC assessment contrary to the weight of the evidence; (2)
relying on VE testimony that conflicted with Plaintiff's RFC
assessment; and (3) determining that Plaintiff was capable
of light work despite Plaintiff's additional exertional and
non-exertional limitations.

A. <u>Standard of Review</u>.

Judicial review of a final decision of the Commissioner
is limited to (1) whether substantial evidence supports the
Commissioner's decision, and (2) whether the Commissioner

applied the correct legal standards.  Seavey v. Barnhart,
276 F.3d 1, 9 (1st Cir. 2001).  The responsibility for
weighing conflicting evidence and resolving issues of
credibility belongs to the Commissioner and his designee,
the ALJ.  See id. at 10.  The Commissioner's findings "as to
any fact, if supported by substantial evidence, shall be
conclusive."  42 U.S.C. § 405(g).  Substantial evidence is
such evidence "as a reasonable mind might accept as adequate
to support a conclusion."  Richardson v. Perales, 402 U.S.
389, 401 (1971).  Accordingly, the court must affirm the
Commissioner's findings "if a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as
adequate to support his conclusion."  Rodriguez v. Sec'y of
Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).
This is true "even if the record arguably could justify a
different conclusion."  Rodriguez Pagan v. Sec'y of Health &
Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

B.     Whether the ALJ's RFC Assessments Were Supported by
       Substantial Evidence.

       Plaintiff first argues that the ALJ's RFC assessments
were flawed because they were not supported by the weight of
the evidence.  The ALJ found that Plaintiff was capable of

15

"light" work, which involves lifting of no more than twenty pounds at a time and frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). Plaintiff contends that, in reaching this conclusion, the ALJ failed to place sufficient weight on the opinion of Dr. Ogoke and placed too much weight on the opinion of Dr. Brown. This court disagrees.

As a general rule, more weight should be given to a treating source's opinion if it is well supported by medically acceptable evidence. 20 C.F.R. § 404.1527(d). In addition, the ALJ should give "more weight to the opinions from the claimant's treating physicians, because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments." Id.

Here, Dr. Ogoke opined that Plaintiff could only lift up to five pounds, carry ten pounds, stand for one-to-two hours in an eight-hour work day, and sit two-to-four hours in an eight-hour work day. (A.R. 371.) The ALJ properly placed little weight on Dr. Ogoke's opinion for several reasons.

16

First, the opinion is inconsistent with Dr. Ogoke's own treatment notes. Dr. Ogoke's notes indicate some tenderness in different areas in Plaintiff's back, but they do not indicate any significant limitations in his functional capacity. (A.R. 161, 163, 167, 444-46.) In fact, Dr. Ogoke's examinations repeatedly observed that Plaintiff exhibited normal strength and normal range of motion. (Id.) Moreover, Dr. Ogoke observed that Plaintiff failed to follow up on his epidural steroid injections, which presented an independent basis for the denial of benefits, as an individual cannot be found disabled if he fails to follow prescribed treatment and offers no sufficient explanation.[2] See 20 C.F.R. §§ 404.1530, 416.930 (instructing claimants to "follow treatment by your physician if this treatment can restore your ability to work. . . . If you do not follow the prescribed treatment, without a good reason, we will not find you disabled."); Tsarelka v. Sec'y of Health and Human Servs., 842 F.2d 529, 534 (1st Cir. 1988) (explaining that "implicit in a finding of disability is a determination that

_____

[2] Dr. Ogoke observed that Plaintiff is "apparently afraid of needles," but this undocumented alleged phobia would not excuse his failure to follow a prescribed treatment plan. (A.R. 371.)

17

existing treatment alternatives would not restore a
claimant's ability to work").

Second, Dr. Ogoke's opinion is inconsistent with
Plaintiff's test results.  X-rays from 1999 revealed a
possible muscle spasm in Plaintiff's cervical spine, which
was otherwise normal, and minimal degenerative changes in
Plaintiff's lumbar spine, which was otherwise normal.  (A.R.
140, 134.)  Imaging results in January 2000, June 2000, and
June 2001 all revealed no significant abnormalities.  (A.R.
163, 169, 373, 423.)  If anything, these results support a
limitation to light work; they do not in any way suggest
that Plaintiff is totally disabled.

Third, Dr. Ogoke's opinion is inconsistent with the
opinions of Plaintiff's other treating physicians as well as
the state agency physicians.  Dr. Azocar observed that
Plaintiff exhibited normal functioning and should refrain
from activities involving "frequent bending and lifting
heavy weights."  (A.R. 156.)  Dr. Brown similarly noted that
Plaintiff's strength and range of motion were normal, and he
concluded only that Plaintiff should avoid activities
involving "excessive bending, twisting, heavy lifting, or

18

other strenuous activities." (A.R. 647.)  These diagnoses are consistent with a limitation to light work, which is exactly the conclusion reached by both of the state agency physicians -- Drs. Baez-Garcia and Lipski -- upon examining Plaintiff's record.

The above evidence -- including Dr. Ogoke's own treatment notes, test results, observations by Plaintiff's treating sources, and RFC assessments by state agency physicians -- undermine Dr. Ogoke's opinion that Plaintiff was unable to perform light work.  Thus, this court cannot say that the ALJ erred by affording little weight to that opinion.

C.    VE Testimony.

Plaintiff also claims that the ALJ erred by relying on VE testimony that conflicted with his RFC assessment. Plaintiff's principal argument here is that the VE opined that Plaintiff could perform the job of packer despite the fact that this vocation is classified as requiring a medium exertional level, which is inconsistent with Plaintiff's RFC.

Although Plaintiff has, in fact, uncovered an error in the VE's testimony, see Dictionary of Occupational Titles

920.587-018, this error is harmless.  Plaintiff concedes, as he must, that the ALJ identified other jobs at the light exertional level that exist in significant numbers in the national economy -- inspector and assembler -- and the existence of only one such job precludes a finding of disability.  <u>See</u> 20 C.F.R. §§ 404.1566(b), 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (<u>in one or more occupations</u>) having requirements which you are able to meet . . . .") (emphasis added).

D.    <u>Additional Limitations</u>.

        Plaintiff next argues that the ALJ erred in determining that Plaintiff was capable of performing light work because the ALJ's RFC assessment contains several additional limitations beyond what is required by light work -- that is, lifting no more than twenty pounds at a time and frequent lifting or carrying of objects weighing up to ten pounds.

        While it is true that the ALJ imposed several additional limitations, both exertional (<u>e.g.</u>, sit/stand option, no lifting more than ten pounds from floor to waist)

and nonexertional (e.g., incidental contact with the public and occasional contact with coworkers), Plaintiff's argument confuses the issue. It is perfectly appropriate for an ALJ to impose additional limitations on Plaintiff's RFC beyond a simple limitation to light work, as long as he incorporates those limitations into his occupational analysis and considers how those limitations erode the occupational base:

> In some instances, an individual can do a little more or less than the exertion specified for a particular range of work . . . .
>
> Where an individual's exertional RFC does not coincide with the definition of any one of the ranges of work as defined in sections 404.1567 and 416.967 of the regulations, the occupational base is affected and may or may not represent a significant number of jobs in terms of the rules directing a conclusion as to disability. The adjudicator will consider the extent of any erosion of the occupational base and access its significance.

Social Security Ruling ("SSR") 83-12. Where it is unclear how the additional limitations affect the occupational base, the ALJ must consult a VE. Id.

Here, the ALJ did just that, expressly noting in his opinion that he questioned the VE about Plaintiff's additional limitations "[t]o determine the extent to which these limitations erode the unskilled light occupational

21

base." (A.R. 541.) In response to this inquiry at the hearing, the VE testified that she considered Plaintiff's additional limitations in her analysis of the occupational base, and ultimately concluded that Plaintiff could perform the jobs of packer, inspector, and assembler. (A.R. 684.) Given that Plaintiff's RFC allowed him to perform at least one of these positions, the ALJ committed no error.

## IV. <u>CONCLUSION</u>

This case presents a familiar scenario. The evidence is to some extent mixed, and the ALJ reasonably explained his rationale for the conclusions he drew. Given the existence of substantial evidence supporting the ALJ's decision, the law bars this court from engaging in second guessing.

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 12) is hereby DENIED, and Defendant's Motion to Affirm the Decision of the Commissioner (Dkt. No. 15) is hereby ALLOWED. The clerk will enter judgment for Defendant. The case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor

_____
 MICHAEL A. PONSOR
Senior U. S. District Judge